# UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JOSEPH BIRD, | Case No. 1:16-cv-00755-SKO |
| Plaintiff, | |
| v. | ORDER ON PLAINTIFF'S SOCIAL SECURITY COMPLAINT |
| NANCY A. BERRYHILL,<br>Acting Commissioner of Social Security,[1] | |
| Defendant. | (Doc. 1) |

## I. INTRODUCTION

On May 31, 2016, Plaintiff Joseph Bird ("Plaintiff") filed a complaint under 42 U.S.C. § 405(g) seeking judicial review of a final decision of the Commissioner of Social Security (the "Commissioner" or "Defendant") denying his application for disability insurance benefits ("DIB"). (Doc. 1.) The matter is currently before the Court on the parties' briefs, which were submitted, without oral argument, to the Honorable Sheila K. Oberto, United States Magistrate

---

[1] On January 23, 2017, Nancy A. Berryhill became the Acting Commissioner of the Social Security Administration. *See* https://www.ssa.gov/agency/commissioner.html (last visited by the court on February 27, 2017). She is therefore substituted as the defendant in this action. *See* 42 U.S.C. § 405(g) (referring to the "Commissioner's Answer"); 20 C.F.R. § 422.210(d) ("the person holding the Office of the Commissioner shall, in his official capacity, be the proper defendant").

Judge.[2]

## II. BACKGROUND

On February 21, 2012, Plaintiff filed claims for DIB and SSI payments, alleging he became disabled on April 10, 2006, due to "Scoliosis," "3 stomach hernias," "Neck pain," "Diabetes," "sharp pain in his legs," and "shortness of breath." (Administrative Record ("AR") 85, 92, 101, 260–67, 288, 318, 404.) Plaintiff was born on May 2, 1968, and was 37 years old on the alleged disability onset date. (AR 28.) The highest level of education Plaintiff completed was the eleventh grade. (AR 41.) From 1997 to 2005, Plaintiff was a laborer for an oil company. (AR 275, 290, 301.) From February–September 2005 and April–June 2006, Plaintiff worked for a plumbing company as a service plumber and a plumbing assistant. (AR 275, 290, 301.) From September 2005–April 2006, Plaintiff was a cashier and stocker at a gas station. (AR 275, 290, 301.) From April–May 2006, Plaintiff worked as a roadside assistant for a roadside assistance service. (AR 275, 290, 301.)

### A. Relevant Medical Evidence[3]

On August 17, 2006, Plaintiff presented to James Mullowney, D.O., for left knee pain as a result of "climbing a lot of stairs." (AR 352.) Dr. Mullowney observed pain and palpation behind Plaintiff's left knee, mild edema, and an abdominal hernia. (AR 352.) Plaintiff was prescribed Indocin and referred to general surgery. (AR 352.)

On January 17, 2012, Plaintiff presented at the emergency department with abdominal pain in the umbilical area. (AR 355.) Plaintiff indicated that he had a history of umbilical hernia without surgical repair beginning in 2001, which was aggravated by bowel movements and prolonged sitting. (AR 358.) Plaintiff was observed to be well-developed and well-nourished in no apparent distress and to ambulate without assistance with a steady gait. (AR 355, 359.) An X-ray of Plaintiff's abdomen was performed that same day, which showed relative paucity of gas in the lower abdomen and no gross abnormality. (AR 354.) The scan did not exclude the possibility of "dilated, fluid-filled bowel loops," and noted that, if clinically indicated, further

---
[2] The parties consented to the jurisdiction of a U.S. Magistrate Judge. (Docs. 9, 10.)
[3] As Plaintiff's assertion of error is limited to the ALJ's RFC and credibility findings, only evidence relevant to those arguments are set forth below.

2

evaluation of CT abdomen and pelvis is recommended. (AR 354.) Plaintiff was diagnosed with a ventral hernia, released to home care, and prescribed Colace and pain medication. (AR 355, 360.) Plaintiff attended follow up visits with Christie Ceballos, P.A., related to his abdominal hernia from January–April 2012. (AR 364–75).

On February 8, 2012, Plaintiff consulted surgeon John Porteous, M.D., regarding a hernia repair. (AR 681–83.) Plaintiff reported normal appetite, no nausea or vomiting, and no abdominal pain. Dr. Porteous observed that Plaintiff "weighs 299 pounds and has a large abdomen with a significant ventral hernia" that is "reducible when [Plaintiff] lies down." (AR 682.) Dr. Porteous discussed with Plaintiff the "negative effects of obesity on hernia repair," and recommended that Plaintiff lose 25 to 30 pounds, noting that he did not believe a hernia repair would "hold at his current weight and size." (AR 682.) Dr. Porteous advised Plaintiff to return in a few months, at which time he would be re-weighed. (AR 683.)

Plaintiff participated in a telephone interview with a representative of the Social Security Administration on March 2, 2012. (AR 296–98.) The representative noted that Plaintiff had no difficulty hearing, reading, breathing, understanding, concentrating, talking, and answering questions, and that Plaintiff was coherent, "very talkative," and "polite." (AR 297.)

On May 30, 2012, Disability Determinations Service non-examining consultant, Martha A. Goodrich, M.D., reviewed the record and analyzed the case. (AR 88–91, 94–98.) She concluded that there was insufficient medical evidence prior to the date of last insured to evaluate Plaintiff's claim for DIB benefits. (AR 88–89.) Regarding Plaintiff's claim for SSI benefits, Dr. Goodrich observed that Plaintiff's physical exams were normal except for a noted ventral hernia that is "easily reducible," and deemed him non-severe. (AR 88, 95.) She indicated that Plaintiff demonstrated the maximum sustained capability for light work. (AR 90, 97.)

Another Disability Determinations Service non-examining consultant, John Durfor, M.D., reviewed the record and analyzed the case on October 24, 2012. (AR 105–118.) Dr. Durfor found Plaintiff's alleged limitations "partially supported" by the medical records, and indicated that the records indicate Plaintiff is treated with medication. (AR 106, 115.) Dr. Durfor concluded that Plaintiff could lift and carry 20 pounds occasionally and 10 pounds frequently,

and stand, walk, and sit 6 hours in an 8-hour workday, with no other limitations. (AR 106–07, 115–16.)

Plaintiff saw PA Ceballos on December 13, 2012, complaining of chronic back, neck, and shoulder pain. (AR 766.) He reported that he went to Texas for a job, but there was no job when he got there. (AR 766.) Plaintiff was referred to physical therapy as a result of his back, neck, and shoulder pain. (AR 766.)

Plaintiff again presented to the emergency department for abdominal pain and vomiting on December 30, 2012. (AR 640.) Plaintiff described his pain as aching, shooting, and stabbing, and rated it a 10 out of 10. (AR 641.) A CT scan of his abdomen found Plaintiff's bowel gas pattern "grossly unremarkable," with no definite evidence of bowel obstruction. (AR 636.) Plaintiff was released with improved symptoms and given medication for nausea and pain. (AR 650–52.)

On January 13, 2013, Plaintiff complained of right shoulder pain he sustained a result of wrestling with his son. (AR 619.) Plaintiff described the pain as sharp, non-radiating, and continuous. (AR 619.) Upon examination, Joe Douglas, M.D., observed Plaintiff had full ranges of active and passive motion in the left arm, limited active and passive ranges of motion in the right arm, was able to abduct about 80 degrees at the right shoulder, and was able to fully bear weight. (AR 623.) An X-ray performed that day showed "some degenerative changes" at the acromioclavicular joint, a normal glenohumeral joint, and no evidence of acute fracture or dislocation. (AR 618.) Plaintiff was prescribed medication for muscle spasms and pain control. (AR 616–17.)

Plaintiff again presented to the emergency department on January 20, 2013, with abdominal pain. (AR 598–604.) On February 7, 2013, Plaintiff underwent surgery by Dr. Porteous to repair approximately four different hernias. (AR 427–29, 433–38.) The hernias had "all coalesced into one defect" and were repaired using "a single piece of mesh." (AR 427.) Dr. Porteous saw Plaintiff on February 15, 2013, for a post-surgical follow up appointment, and instructed Plaintiff to continue to wear an abdominal binder when not in bed and attempt to lose weight to "take the pressure off the hernia repair." (AR 688.) On March 6, 2013, Dr. Porteous

noted no evidence of recurrence of the hernia. (AR 690.) He discussed "activity restrictions" with Plaintiff and advised Plaintiff to wear the abdominal binder an additional two months when he is up and about. (AR 690.) Dr. Porteous recommended that Plaintiff see him when necessary. (AR 690.)

Plaintiff saw Dr. Porteous on July 3, 2013, complaining of severe pain and inability to work. (AR 692.) Specifically, Plaintiff indicated that he had tried to go back to work but the "surgical site hurts him too much." (AR 692.) Plaintiff's abdominal examination showed a recurrence of the hernia with no other defects and no incarceration. (AR 692.) A CT scan of Plaintiff's abdomen performed on July 11, 2013, showed postsurgical changes associated with ventral hernia repair with no recurrent hernia, as well as "[m]ild scoliosis and degenerative disease of the spine." (AR 706-07.) At a follow up appointment July 19, 2013, Dr. Porteous noted Plaintiff's CT scan results showing no recurrent total abdominal hernia (AR 706-07), despite Dr. Porteous' view that Plaintiff's abdomen "palpate[d] like a hernia." (AR 694.) Dr. Porteous explained that Plaintiff's weight was "much too large for any attempt at repeat repair" and that he had to lose "a significant amount of weight" before the possibility of another repair. (AR 694.) Dr. Porteous speculated that "it may be the repair is just stretching." (AR 694.)

On July 29, 2013, Plaintiff presented to PA Ceballos with right shoulder pain. (AR 734.) An X-ray was performed of Plaintiff's right shoulder on August 13, 2013, which showed arthritic changes but no acute findings. (AR 783.) PA Ceballos diagnosed Plaintiff with osteoarthritis in his right shoulder on August 29, 2013, and prescribed him pain medication. (AR 729–32.)

On October 16, 2013, Plaintiff attended a follow up appointment with Dr. Porteous. (AR 696.) He registered a five-pound weight gain from his last appointment three months prior. (AR 696.) Dr. Porteous once again discussed the need for Plaintiff to lose weight before attempting a second hernia repair. Plaintiff was instructed to return for a follow up appointment in 2-3 months and to try to reduce his meal portions and increase his exercise. (AR 696.) On February 18, 2014, no weight loss was noted, and Plaintiff was advised to return in 3–4 months. (AR 697.)

Plaintiff was seen by licensed clinical social worker Darlene Thompson on October 24, 2013, for symptoms of depression and anxiety. (AR 786.) Plaintiff reported having a lot of

"situational stressors," such as loss of job, inability to work, and housing and financial issues. (AR 786.) He stated he had an irritable and depressed mood, difficulty sleeping, low energy, and flashback memories relating to a prior sexual assault. (AR 786.) On November 23, 2013, Plaintiff was indicated as having been prescribed Paxil for depression. (AR 722.)

**B.     Plaintiff's Statement**

On May 24, 2012, Plaintiff completed an "Exertion Questionnaire." (AR 313–15.) Plaintiff stated that he lived in a house with family. (AR 313.) He described his disabling symptoms as pain in his neck and back, and his hernia. (AR 313.) When asked what kinds of things he does on an average day and how those activities make him feel, Plaintiff responded "not to [sic] good." (AR 313.) He stated that he hurts after he walks a lot. (AR 313.) Plaintiff reported he does not climb stairs, cannot lift anything, and cannot carry things very far. (AR 314.) Plaintiff shopped for groceries and cleaned his home, but did not drive a car, work on cars, or perform yard work. (AR 314.) He reported that he can only perform housework or other chores for about 10 minutes before having to stop, stating that his "neck and back, sometime [sic] my hernia stop me from doing anything." (AR 315.) Plaintiff slept for 8 hours a day and napped for about 1 hour during the day. (AR 315.) He listed no medications and no assistive devices. (AR 315.)

**C.     Administrative Proceedings**

Plaintiff filed applications for DIB and SSI payments on February 21, 2012, alleging he became disabled on April 10, 2006. (AR 85, 92, 101, 260–67, 288, 318, 404.) The Social Security Administration denied Plaintiff's applications for benefits initially on June 7, 2012, and again on reconsideration on October 26, 2012. (AR 126–33, 138–43.) Plaintiff requested a hearing before an Administrative Law Judge ("ALJ"). (AR 144–49.) On April 22, 2014, Plaintiff appeared with counsel and testified before an ALJ as to his alleged disabling conditions. (AR 36–71.)

In a decision dated June 12, 2014, the ALJ found that Plaintiff was not disabled. (AR 22–34.) The ALJ's decision became the final decision of the Commissioner when the Appeals Council denied Plaintiff's request for review on March 30, 2016. (AR 1–7.)

**1. Plaintiff's Testimony**

The highest level of education Plaintiff completed was eleventh grade. (AR 41.) Plaintiff said he lives with his fiancée, mother, and 16-year-old stepson. (AR 47.) Plaintiff's fiancée is a caregiver and his mother is disabled. (AR 47.)

Plaintiff testified that he has pain "in all of my body, in my arms and legs" caused by neuropathy as a result of diabetes. (AR 42.) Plaintiff also experienced tingling and numbness in his fingers and in both thighs as a result of his diabetes. (AR 43, 52.) Plaintiff testified he has a new hernia located above his prior hernia, and that he is scheduled to see the doctor on June 15, 2014, to determine whether surgery is warranted. (AR 44–45.)

Plaintiff stated that if he were to go back to work full-time, he would have trouble bending over and lifting things. (AR 51.) Plaintiff testified he has right shoulder arthritis and constant pain that gets worse with use, and that he tries to "massage it, put medicine on it, take pills for it, medicines for it." (AR 59.) He stated that he could perform a job that required reaching forward for "less than half a day." (AR 59.) Plaintiff testified that he is left handed, and that when he extends his arms to put on a long-sleeved jacket, he puts his right arm in first. (AR 60.)

Plaintiff testified the longest he can use his hands before he has to stop and rest is 30 minutes, and would be able to resume use of them after 30 to 40 minutes. (AR 52–53.) He stated that it gets progressively harder to use his hands throughout the day, and he would only be able to use his hands "less than half a day" in an 8-hour day. (AR 53.) Plaintiff testified that the most he can lift is 5 pounds due to his hernia, but that his doctor restricted him to lifting a maximum of 10 pounds. (AR 53–54.) He stated that due to the numbness in his leg he can only stand for 30 to 45 minutes at a time, and has to elevate his legs while sitting. (AR 54.) Plaintiff testified that he either lies down or elevates his legs "[a]bout a couple hours" per day. (AR 54.) He stated that it is easier to walk than stand, and that it would be difficult to do a job where he was on his feet for most of the day. (AR 54–55.)

Plaintiff testified that he would also have problems working due to his diabetes, which he has trouble controlling, and his hernia. (AR 51.) Plaintiff said he took prescription medications

that made him feel dizzy, but he informed his doctor who adjusted his medication. (AR 45–46.) He testified that he started treating his diabetes with oral medication, and then started using insulin beginning of 2014. (AR 55.) He takes insulin and checks his blood sugar four times a day. (AR 42.) Plaintiff stated that he experiences high and low blood sugars twice a day, and that he takes extra insulin to improve his symptoms, which takes 45 minutes. (AR 57.) Plaintiff testified that during these episodes, the pain in his arms and legs increases, his hernia starts hurting, and he becomes nauseated. (AR 57.)

Plaintiff sought treatment for mental health at one time, and testified he was currently on medication for depression. (AR 46.) Plaintiff said the medication helps his depression at times. (AR 46.) He stated that he is depressed by "not being able to work like I want to, to the point where I can't pay the bills, and sometimes I get the idea of I want to, you know, end it." (AR 46.) Plaintiff testified his suicidal thoughts started when he "couldn't work," and that he waited until October 2013 to see a behavioral health doctor because he didn't have insurance and couldn't afford it. (AR 55.) He stated that "stress" from "being around other things, other people, and knowing that I'm in pain" would keep him from working. (AR 58.) Plaintiff testified that he gets stressed out at home by "[n]ot being able to help pay the bills" and by his stepson. (AR 58.) He stated when he gets stressed out, he isolates himself from family and has suicidal thoughts. (AR 58.) Plaintiff testified that his mental health issues began in 2013. (AR 61.)

Plaintiff testified that, when home alone, he cooks meals using the microwave, tries to relax, watches television for 1.5 to 2 hours total, and checks his Facebook page and email. (AR 48–49.) He stated he has a driver's license and drives three times a week, normally to the store. (AR 49–50.) Plaintiff testified that he has no other outside activities, and has not taken any long trips since his alleged date of onset. (AR 50–51.)

Plaintiff testified he smokes five cigarettes a day and has been asked to cut down his smoking by his doctor. (AR 43.) Plaintiff is 6' 10" and weighs 315 pounds. (AR 44.) He was asked by his doctor to lose 25 pounds. (AR 44.) He testified that he has not performed any work, including part-time or side jobs, after 2006. (AR 41.) Plaintiff stated that he had to quit his full-time roadside assistance job after one month "[b]ecause of the bending over changing tires and

stuff like that was causing problems." (AR 62.) Plaintiff testified that he performed full-time work as a plumbing assistant doing short-term jobs. (AR 63.) He stated that his work as a construction laborer was at an apprentice level, and that he framed the walls for houses lifting more than 100 pounds and used power tools and hand tools. (AR 63–64.)

Regarding the medical record, Plaintiff's counsel informed the ALJ at the hearing that counsel was missing nerve conduction studies that were not included with Plaintiff's treating physician's records, and indicated that he had twice-requested the records be sent. (AR 39–40, 70.) The ALJ requested that the records be provided to him by May 9, 2014. (AR 40.)

### 2. Vocational Expert's Testimony

A Vocational Expert ("VE") testified at the hearing that Plaintiff had past work as a framer, Dictionary of Operational Titles (DOT) code 869.684-010, which was medium exertional work, with a specific vocational preparation (SVP)[4] of 4 and "very heavy" as performed. (AR 65–66.) The VE also identified Plaintiff's past work of road side assistant (DOT code 915.684-010, heavy, SVP 3); plumbers assistant (DOT code 869.664-014, heavy, SVP 4); plumber (DOT code 862.381-030, heavy, SVP 7); and cashier/stocker (DOT code 211.462-010, light, SVP 2). (AR 348.)

In a first hypothetical, the ALJ asked the VE to consider a person of Plaintiff's age, education, and with his work history, as well as transferrable or acquired skills the VE previously identified. (AR 67.) The VE was also to assume this person could sit 6 hours but stand and/or talk less than 2 hours each; lift and/or carry less than 10 pounds occasionally; never climb, balance, stoop, kneel, crouch, or crawl; would need numerous unscheduled rest breaks—more frequently than an employer would normally allow—and would not have sufficient concentration ability for even simple, routine, repetitive tasks. (AR 67.) The VE testified that there was no such work that the person could perform. (AR 67.)

The ALJ then posed a second hypothetical regarding a person of Plaintiff's age,

---

[4] Specific vocational preparation, as defined in DOT, App. C, is the amount of lapsed time required by a typical worker to learn the techniques, acquire the information, and develop the facility needed for average performance in a specific job-worker situation. DOT, Appendix C – Components of the Definition Trailer, 1991 WL 688702 (1991). Jobs in the DOT are assigned SVP levels ranging from 1 (the lowest level – "short demonstration only") to 9 (the highest level – over 10 years of preparation). *Id.*

9

education, and with his work history, as well as transferrable or acquired skills the VE previously identified, who could work at jobs involving simple, routine, repetitive tasks; could also sit, stand, walk 6 out of 8 hours each with normal breaks; lift and/or carry 20 pounds occasionally and 10 pounds frequently; could never climb ladders, ropes, or scaffolds; and could occasionally climb ramps or stairs. (AR 68.) The VE testified that this individual could perform Plaintiff's past work of cashier/stocker (AR 348), and could also perform other work in the national economy as an assembler, DOT code 701.687.010, light exertion level and SVP 2; hand packer, DOT code 920.687-166, light exertion level and SVP 2; and photocopying machine operator, DOT code 207.685-014, light exertion level and SVP 2. (AR 68–69.) The VE testified that all of these jobs require the worker to be on his/her feet more than 6 hours in an 8-hour day. (AR 69.)

**D.     The ALJ's Decision**

In a decision dated June 12, 2014, the ALJ found that Plaintiff was not disabled. (AR 22–35.) The ALJ conducted the five-step disability analysis set forth in 20 C.F.R. § 416.920. (AR 24–29.) The ALJ decided that Plaintiff has not engaged in substantial gainful activity since January 1, 2012, the alleged onset date (step 1). (AR 24.) The ALJ found that Plaintiff had the severe impairments of (1) hernias, (2) diabetes, (3) obesity, and (4) depression (step 2). (AR 24) However, Plaintiff did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 ("the Listings") (step 3). (AR 24–26.) The ALJ determined that Plaintiff had the residual functional capacity ("RFC")[5]

> to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except he can perform only simple, routine, and repetitive tasks, occasionally climb ramps and stairs, and never climb ladders, ropes, or scaffolds.

(AR 26.)

---

[5] RFC is an assessment of an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis of 8 hours a day, for 5 days a week, or an equivalent work schedule. Social Security Ruling 96-8p. The RFC assessment considers only functional limitations and restrictions that result from an individual's medically determinable impairment or combination of impairments. *Id.* "In determining a claimant's RFC, an ALJ must consider all relevant evidence in the record including, inter alia, medical records, lay evidence, and 'the effects of symptoms, including pain, that are reasonably attributed to a medically determinable impairment.'" *Robbins v. Soc. Sec. Admin.*, 466 F.3d 880, 883 (9th Cir. 2006).

Given his RFC, the ALJ determined that Plaintiff was not disabled because he was able to perform his past relevant work as a cashier/stocker (DOT 231.462-010, light exertion level, and SVP 2) (step 4). (AR 28.) The ALJ made the alternative finding that Plaintiff could perform a significant number of other jobs in the local and national economies, specifically assembler, hand packer, and photocopying machine operator (step 5). (AR 28–29.) In reaching his conclusions, the ALJ also determined that Plaintiff's subjective complaints were not fully credible. (AR 27–28.)

### III. SCOPE OF REVIEW

The ALJ's decision denying benefits "will be disturbed only if that decision is not supported by substantial evidence or it is based upon legal error." *Tidwell v. Apfel*, 161 F.3d 599, 601 (9th Cir. 1999). In reviewing the Commissioner's decision, the Court may not substitute its judgment for that of the Commissioner. *Macri v. Chater*, 93 F.3d 540, 543 (9th Cir. 1996). Instead, the Court must determine whether the Commissioner applied the proper legal standards and whether substantial evidence exists in the record to support the Commissioner's findings. *See Lewis v. Astrue*, 498 F.3d 909, 911 (9th Cir. 2007). "Substantial evidence is more than a mere scintilla but less than a preponderance." *Ryan v. Comm'r of Soc. Sec.*, 528 F.3d 1194, 1198 (9th Cir. 2008). "Substantial evidence" means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consol. Edison Co. of N.Y. v. NLRB*, 305 U.S. 197, 229 (1938)). The Court "must consider the entire record as a whole, weighing both the evidence that supports and the evidence that detracts from the Commissioner's conclusion, and may not affirm simply by isolating a specific quantum of supporting evidence." *Lingenfelter v. Astrue*, 504 F.3d 1028, 1035 (9th Cir. 2007) (citation and internal quotation marks omitted).

### IV. APPLICABLE LAW

An individual is considered disabled for purposes of disability benefits if he or she is unable to engage in any substantial, gainful activity by reason of any medically determinable physical or mental impairment that can be expected to result in death or that has lasted, or can be expected to last, for a continuous period of not less than twelve months. 42 U.S.C.

1 §§ 423(d)(1)(A), 1382c(a)(3)(A); *see also Barnhart v. Thomas*, 540 U.S. 20, 23 (2003). The impairment or impairments must result from anatomical, physiological, or psychological abnormalities that are demonstrable by medically accepted clinical and laboratory diagnostic techniques and must be of such severity that the claimant is not only unable to do his previous work, but cannot, considering his age, education, and work experience, engage in any other kind of substantial, gainful work that exists in the national economy. 42 U.S.C. §§ 423(d)(2)–(3), 1382c(a)(3)(B), (D).

The regulations provide that the ALJ must undertake a specific five-step sequential analysis in the process of evaluating a disability. In the First Step, the ALJ must determine whether the claimant is currently engaged in substantial gainful activity. 20 C.F.R. §§ 404.1520(b), 416.920(b). If not, in the Second Step, the ALJ must determine whether the claimant has a severe impairment or a combination of impairments significantly limiting his from performing basic work activities. *Id*. §§ 404.1520(c), 416.920(c). If so, in the Third Step, the ALJ must determine whether the claimant has a severe impairment or combination of impairments that meets or equals the requirements of the Listing of Impairments ("Listing"), 20 C.F.R. 404, Subpart P, App. 1. *Id*. §§ 404.1520(d), 416.920(d). If not, in the Fourth Step, the ALJ must determine whether the claimant has sufficient residual functional capacity despite the impairment or various limitations to perform his past work. *Id*. §§ 404.1520(f), 416.920(f). If not, in Step Five, the burden shifts to the Commissioner to show that the claimant can perform other work that exists in significant numbers in the national economy. *Id*. §§ 404.1520(g), 416.920(g). If a claimant is found to be disabled or not disabled at any step in the sequence, there is no need to consider subsequent steps. *Tackett v. Apfel*, 180 F.3d 1094, 1098–99 (9th Cir. 1999); 20 C.F.R. §§ 404.1520, 416.920.

## V. DISCUSSION

Plaintiff contends that the ALJ erred in failing to provide evidence to support his RFC findings. (Doc. 15 at 6.) Plaintiff also asserts that the ALJ erred in failing to provide legally sufficient reasoning for finding Plaintiff not credible. (*Id*.) The Commissioner contends that the ALJ's RFC findings were supported by substantial evidence, and that the ALJ properly found

12

Plaintiff not credible. (Doc. 16 at 4–10.)

**A. The ALJ Erred in Failing Adequately to Explain How He Determined the Particular Limitations in Plaintiff's Residual Functional Capacity Assessment.**

**1. Legal Standard**

The RFC is the "maximum degree to which [a plaintiff] retains the capacity for sustained performance of the physical-mental requirements of jobs." 20 C.F.R. 404, Subpt. P, App. 2 § 200(c). It is an administrative decision as to the most a plaintiff can do, despite his limitations. Social Security Ruling ("SSR") 96–8p. The ALJ must assess all of the relevant evidence, including evidence regarding symptoms that are not severe, to determine if the claimant retains the ability to work on a "regular and continuing basis," *e.g.*, eight hours a day, five days a week. *Reddick v. Chater*, 157 F.3d 715, 724 (9th Cir. 1998); *Lester v. Chater*, 81 F.3d 821, 833 (9th Cir. 1995); SSR 96–8p. The RFC assessment must be based on all of the relevant evidence in the case record, such as: medical history; the effects of treatment, including limitations or restrictions imposed by the mechanics of treatment (*e.g.*, side effects of medication); reports of daily activities; lay activities; recorded observations; medical source statements; effects of symptoms, including pain, that are reasonably attributed to a medically determinable impairment; evidence from work attempts; need for structured living environment; and work evaluations. SSR 96–8p.

In making an RFC determination, the ALJ shall set out a detailed and thorough summary of the facts and conflicting clinical evidence, state any interpretations, and make findings. *Morgan v. Comm'r of Social Sec. Admin.,* 169 F.3d 595, 600–01 (9th Cir. 1999) (citation omitted). An ALJ is not required to discuss all the evidence presented, but must explain the rejection of uncontroverted medical evidence, as well as significant probative evidence. *Vincent on Behalf of Vincent v. Heckler,* 739 F.2d 1393, 1394–95 (9th Cir. 1984) (citation omitted). Moreover, an ALJ must consider all of the relevant evidence in the record and may not point to only those portions of the records that bolster his findings. *See, e.g., Holohan v. Massanari,* 246 F.3d 1195, 1207 (9th Cir. 2001) (holding that an ALJ cannot selectively rely on some entries in the plaintiff's records while ignoring others); *Aukland v. Massanari,* 257 F.3d 1033, 1035 (9th Cir. 2001) ("[T]he [ALJ]'s decision 'cannot be affirmed simply by isolating a specific quantum

of supporting evidence.'") (citing *Sousa v. Callahan,* 143 F.3d 1240, 1243 (9th Cir. 1998)); *see also Reddick,* 157 F.3d at 722–23 (it is impermissible for the ALJ to develop an evidentiary basis by "not fully accounting for the context of materials or all parts of the testimony and reports"). In addition, "an explanation from the ALJ of the reason why probative evidence has been rejected is required so that . . . [the][C]ourt can determine whether the reasons for rejection were improper." *Cotter v. Harris,* 642 F.2d 700, 706–07 (3d Cir. 1981) (internal citation omitted). *See also Flores v. Shalala,* 49 F.3d 562, 571 (9th Cir. 1995) (The "ALJ's written decision must state reasons for disregarding [such] evidence.")

### 2. Analysis

In his RFC, the ALJ limited Plaintiff to "simple, routine, and repetitive tasks"; "occasionally" climbing ramps and stairs; and "never" climbing ladders, ropes, or scaffolds. (AR 26.) This finding in the RFC would indicate that the ALJ viewed Plaintiff's physical and mental limitations as impairment-related, but the ALJ's finding does not identify any medical opinion with such limitations or explain how those limitations were derived or what evidence supports them.

The only opinion evidence in the record as to Plaintiff's physical limitations is the opinions of state agency medical consultants Dr. Goodrich and Dr. Durfor. Dr. Goodrich opined that Plaintiff's hernia was "easily reducible," that his impairments were non-severe, and that he had demonstrated the maximum sustained capability for light work. (AR 88–89, 90, 95, 97.) Dr. Durfor found Plaintiff's alleged limitations "partially supported" by the medical records, and indicated that the records indicate Plaintiff is treated with medication. (AR 106, 115.) He concluded that Plaintiff could lift and carry 20 pounds occasionally and 10 pounds frequently, and could stand, walk, and sit 6 hours in an 8-hour workday, with no other limitations. (AR 106–07, 115–16.) Neither Dr. Goodrich nor Dr. Durfor imposed postural limitations. The ALJ, however, made no mention of these opinions in his decision, leaving the Court to conclude that he simply ignored them and impermissibly substituted his own judgment. *See Sawyer v. Astrue,* 303 Fed. App'x 453, 455 (9th Cir. 2008) (citations omitted) (The ALJ is "required to consider as opinion evidence" the findings of state agency medical consultant, and also is "required to

14

explain in his decision the weight given to such opinions."); *Day*, 522 F.2d at 1156 (ALJ may not make his or her own lay medical assessment); *Bridges v. Colvin*, No. CV 16-1130-E, 2016 WL 7167870, at *5 (C.D. Cal. Dec. 8, 2016). *See also* SSR 96–6p ("Administrative law judges . . .may not ignore the [] opinions [of state agency medical and psychological consultants] and must explain the weight given to the opinions in their decisions."); SSR 96–5p (State agency "medical and psychological consultant findings about the nature and severity of an individual's impairment(s), including any RFC assessments, become opinion evidence," and "administrative law judges . . . must address the[se] opinions in their decisions.").

The ALJ also improperly rejected probative medical evidence relating to Plaintiff's alleged right shoulder pain, based on a mischaracterization of the evidence in the record. The ALJ found that Plaintiff "reported right shoulder pain once, on January 13, 2013," and concluded, apparently based on that finding, that "[t]he evidence clearly does not support his claims regarding his right shoulder/arm dysfunction." (AR 27.) The record demonstrates, however, that Plaintiff reported chronic back, neck, and shoulder pain to treating PA Ceballos on December 13, 2012, and was referred to physical therapy. (AR 766.) Plaintiff presented to PA Ceballos with right shoulder pain again on July 29, 2013. (AR 734.) An X-ray was performed of Plaintiff's right shoulder on August 13, 2013, which showed arthritic changes. (AR 783.) PA Ceballos diagnosed Plaintiff with osteoarthritis in his right shoulder on August 29, 2013, and prescribed him pain medication. (AR 729–32.) The medical evidence of Plaintiff's osteoarthritis in his right shoulder is significant probative evidence that the ALJ should not have rejected without proper discussion.[6] *See Vincent*, 739 F.2d at 1394–95; *Flores*, 49 F.3d at 571. Thus, based on the relevant record, the ALJ's conclusion that the evidence "clearly" did not support Plaintiff's claims of right shoulder/arm dysfunction is not supported by substantial evidence in the record as a whole. *See Magallanes v. Bowen,* 881 F.2d 747, 750 (9th Cir. 1989); *Glasgow v. Astrue*, No. CV-09-0223-CI, 2010 WL 3363606, at *7 (E.D. Wash. Aug. 20, 2010).

With respect to mental limitations, no state psychologist was consulted to opine as to

---

[6] This mischaracterization is indicative of the ALJ's failure to provide a careful medical analysis of over 300 pages of medical records.

15

Plaintiff's mental limitations, and there is no opinion evidence in the record otherwise limiting Plaintiff to "simple, routine, and repetitive tasks." Plaintiff was seen by licensed clinical social worker Ms. Thompson on October 24, 2013, for symptoms of depression and anxiety, and the evidence shows that Plaintiff was prescribed Paxil for depression. (AR 722, 786.) It is possible that this evidence could support the restriction of "simple, routine, and repetitive tasks" the ALJ adopted. The ALJ, however, did not purport to rely on this evidence. The evidence upon which the ALJ did rely, if any, remains unknown, as he impermissibly failed to offer any reason(s) for the imposition of this limitation. *See Smith v. Astrue*, No. EDCV 10–1393–JEM, 2011 WL 2749561, at *3, 6 (C.D. Cal. July 13, 2011) (reversing and remanding where the ALJ limited the plaintiff to "non-public object oriented simple repetitive tasks" without any explanation or citation to evidence in the record and without disclosing his reasoning).

In sum, while the Commissioner regards overall RFC assessments as an administrative determination for the ALJ to make, SSR 96–5p, 20 C.F.R. 404.1527(e), an ALJ's RFC determination nonetheless must be supported by substantial evidence and the reasoning behind the RFC explained. 42 U.S.C. § 405(b); 20 C.F.R. § 405.373. Here, in making his RFC findings, the ALJ merely described the medical evidence and then stated conclusions, without explaining how he arrived at his conclusions or what evidence supports his conclusions. No medical opinions specifically endorse the particular limitations the ALJ defined in the RFC assessment. Without adequate explanation of the record, without specific support from an expert source, and without potentially synthesizing testimony from a medical expert, the ALJ apparently defined his own limitations for Plaintiff. This was error. *See Day v. Weinberger*, 522 F.2d 1154, 1156 (9th Cir. 1975) (the ALJ was not qualified as a medical expert and therefore could not permissibly go outside the record to consult medical textbooks for purpose of making his own assessment of the claimant's physical condition); *Nguyen v. Chater*, 172 F.3d 31, 35 (1st Cir. 1999) ("As a lay person, . . . the ALJ was simply not qualified to interpret raw medical data in functional terms and no medical opinion supported the determination."); *Manso–Pizarro v. Sec'y of Health and Human Servs.*, 76 F.3d 15, 17 (1st Cir. 1996) ("With few exceptions, . . . an ALJ, as a layperson, is not qualified to interpret raw data in a medical record."); *Rohan v. Chater*, 98 F.3d 966, 970

16

(7th Cir. 1996) ("ALJs must not succumb to the temptation to play doctor and make their own independent medical findings.").

An error "is harmless where it is inconsequential to the ultimate nondisability determination." *Molina v. Astrue*, 674 F.3d 1104, 1115 (9th Cir. 2012) (citations and quotations omitted). In light of the VE's testimony based on the ALJ's RFC findings, the Court cannot deem the ALJ's errors to have been harmless. *See Blessing v. Astrue*, No. 12–cv–05275–JRC, 2013 WL 316153, at *9 (W.D. Wash. Jan. 28, 2013) (reversing and remanding with instructions that the RFC based on an improper evaluation of the medical evidence be "re-done" because "[t]he determination regarding an RFC depends on a proper evaluation of the medical evidence."); *Hines v. Astrue*, No. 11-CV-05252 BHS, 2012 WL 834310, at *7 (W.D. Wash. Feb. 13, 2012) ("[O]n remand, the ALJ should re-evaluate the residual functional capacity, taking into consideration the conclusions of the state agency experts and providing an explanation of the weight given to such opinions."). *Cf. Papaccio v. Colvin*, No. CV-16-01225-PHX DGC, 2017 WL 1241880, at *6 (D. Ariz. Apr. 4, 2017) (where the ALJ's RFC finding included only "conclusory explanations" and was not "specific" and "legitimate" as is required to reject a contradicting physician opinion, the Court remanded and instructed the ALJ to "provide a more thorough explanation of his reasoning behind weight given or not given to medical opinions used in reaching that determination."); *Reeves v. Astrue*, No. ED CV 07-1322-PLA, 2008 WL 5179035, at *5 (C.D. Cal. Dec. 10, 2008) (same).

**B.  Remand for Further Proceedings is Appropriate.**

The decision of whether to remand for further proceedings or order an immediate award of benefits is within the district court's discretion. *Harman v. Apfel*, 211 F.3d 1172, 1175–78 (9th Cir. 2000). The Ninth Circuit has put forth a "test for determining when evidence should be credited and an immediate award of benefits directed." *Harman,* 211 F.3d at 1178. It is appropriate where: (1) the ALJ has failed to provide legally sufficient reasons for rejecting such evidence, (2) there are no outstanding issues that must be resolved before a determination of disability can be made, and (3) it is clear from the record that the ALJ would be required to find the claimant disabled were such evidence credited. *Id.* (quoting *Smolen v. Chater,* 80 F.3d 1273,

1292 (9th Cir. 1996)).

Here, outstanding issues must be resolved. *Cf. Smolen,* 80 F.3d at 1292. There is a large volume of medical and other evidence, and the record is not conclusive. The ALJ is responsible for determining credibility and resolving ambiguities and conflicts in the medical evidence. *Reddick,* 157 F.3d at 722; *Andrews v. Shalala,* 53 F.3d 1035, 1039 (9th Cir. 1995). If the medical evidence in the record is not conclusive, sole responsibility for resolving conflicting testimony and questions of credibility lies with the ALJ. *Sample v. Schweiker,* 694 F.2d 639, 642 (9th Cir. 1982) (citations and quotations omitted). Therefore, remand is appropriate to allow the Commissioner the opportunity to consider properly all of the medical evidence as a whole and to incorporate the properly considered medical evidence into the consideration of Plaintiff's RFC. *See id.* The ALJ will then make a new RFC determination incorporating all of Plaintiff's credible limitations. Additional relevant records may be requested by the Commissioner, or submitted by Plaintiff, including the nerve conduction studies, which are referenced in the record (AR 39–40, 70), as well as records relating to Plaintiff's Facebook webpage that he testified he maintains (AR 48–49).[7] Attempts to obtain additional records should be described in the record. Finally, new vocational expert testimony must be taken at steps four and five to consider the effects of Plaintiff's newly-assessed RFC on his occupational base. *See Gonzalez v. Sullivan,* 914 F.2d 1197, 1202 (9th Cir. 1990).

Because the ALJ's consideration of the medical evidence clearly requires reevaluation, there is no need to address fully the remaining issues in Plaintiff's Opening Brief. However, the Court notes that the medical evidence was not evaluated properly, and a determination of a claimant's credibility relies in part on the assessment of the medical evidence. *See* 20 C.F.R. § 404.1529(c). The entire record should therefore be evaluated anew.

//

---

[7] A cursory review of a publicly-available Facebook website appearing to belong to Plaintiff suggests there is reason to question whether Plaintiff is in fact disabled. *See* Joe Bird, FACEBOOK (July 19, 2017), https://www.facebook.com/joe.bird.357, attached hereto as Exhibit A. Because this information was not in the record and therefore not relied on by the ALJ, the Court may not rely on it now to uphold his decision. *See Bray v. Comm'r of Soc. Sec. Admin.*, 554 F.3d 1219, 1225–26 (9th Cir. 2009). But the Court nevertheless observes that this information "create[s] serious doubt that [Plaintiff was], in fact, disabled" during the time period alleged. *Garrison v. Colvin*, 759 F.3d 995, 1021 (9th Cir. 2014).

18

## VI. CONCLUSION AND ORDER

Based on the foregoing, the Court finds that the ALJ's decision is not supported by substantial evidence and is, therefore, VACATED and the case is REMANDED to the ALJ for further proceedings consistent with this Order. The Clerk of this Court is DIRECTED to enter judgment in favor of Plaintiff Joseph Bird and against Defendant Nancy A. Berryhill, Acting Commissioner of Social Security.

IT IS SO ORDERED.

Dated: **August 3, 2017**  /s/ *Sheila K. Oberto*
UNITED STATES MAGISTRATE JUDGE